RECEIVED IN ALEXANDRIA, LA.
JUL 19 2010
TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| **CINDY TATUM** | **CIVIL ACTION NO. 1:08-cv-00610** |
| -vs- | **JUDGE DRELL** |
| **SOUTHERN SYSTEMS, INC.** | **MAGISTRATE JUDGE KIRK** |

### R U L I N G

Pending before the Court is a Motion for Summary Judgment (Doc. 37) filed by the Defendant, Southern Systems, Inc. ("Southern"), seeking dismissal of the claims of the Plaintiff in this matter, Cindy Tatum ("Ms. Tatum"). For the reasons that follow, the Defendant's motion will be DENIED. Disposition will follow by a separate order.

**I.  Background**

This products liability suit arises from an accidental injury which took place at the Alliance Compressors, Inc. ("Alliance") plant in Natchitoches, Louisiana on September 30, 2006. The Plaintiff, Ms. Tatum, was working in the "final pack" area of the Alliance plant that day, where her job was to pull rubber plugs out of compressors that came to her via a conveyor system. While working, Ms. Tatum's right hand became caught in the conveyor system, causing her serious hand injuries. According to the complaint, four of Ms. Tatum's fingers were tragically severed by the machine.

On August 15, 2005, more than one year before Ms. Tatum's accident,

Southern had submitted a proposal to Alliance to install an overhead monorail system in Alliance's Natchitoches plant. This system would be used to transport compressors throughout the plant for various stages of the manufacturing process. Alliance accepted that proposal, and Southern completed installation of the system in December 2005.

Included in this system is a motorized, dual strand transport conveyor in the "final pack" area, which is the portion of the system on which Ms. Tatum was injured. In this area, compressors are removed from the monorail system, placed on pallets, and passed down a gravity-powered roller conveyor to the "plugs station." At the plugs station, an employee called an "unplugger" (in this case, Ms. Tatum) removes plugs from the compressors, which are then transported to the "lane sort station," where the compressors are separated. It is uncontested that on the date of the accident, the plugs station had been moved by Alliance employees to a position over the dual strand conveyor, where the accident occurred. It is also documented that Ms. Tatum stuck her hand deep into the moving conveyor system when she was injured.

Ms. Tatum filed suit against Southern on September 18, 2007, seeking damages against Southern under the Louisiana Products Liability Act ("LPLA"), La. R.S. § 9:2800.51 et seq.[1] (Doc. 1-1). On May 5, 2008, Southern removed the suit to this court on diversity grounds. (Doc. 1). Southern subsequently filed the instant Motion

---

[1] Southern's Notice of Removal (Doc. 1) states that the suit was filed on September 8. After reviewing the copy of the petition on the record (Doc. 1-1), however, the Court is convinced that Southern is mistaken, as the handwritten filing date clearly reads September 18.

2

for Summary Judgment (Doc. 37), arguing that the undisputed facts do not support any theory of recovery offered by Ms. Tatum. The Court has allowed full briefing on this motion. After carefully considering all of the materials submitted by the parties, we are now prepared to rule.

II. **Law and Analysis**

    A. **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), the Court will grant a party's motion for summary judgment only if:

> the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

In conducting this analysis, the Court must construe "all of the evidence and all of the factual inferences from the evidence . . . in a light most favorable to the party opposing the motion." King Realty Co., Inc. v. Chevron USA, Inc., 575 F.3d 510, 517 (5th Cir. 2009). Any doubts are likewise resolved in favor of the nonmoving party. U.S. ex rel. Longhi v. United States, 575 F.3d 458, 465 (5th Cir. 2009). Once the movant has directed the Court's attention to portions of the record which reflect the absence of a genuine issue of material fact, the nonmoving party bears the burden of demonstrating that a genuine issue of material fact exists. United States v. $ 92,203.00 in U.S. Currency, 537 F.3d 504, 506-07 (5th Cir. 2008). "However, mere

conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment." Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996).

**B.     Discussion**

Southern contends that two critical facts support its motion for summary judgment: (1) Alliance employees moved the plugs station above the above the dual strand conveyor, contrary to a design layout that purportedly had been presented to Southern by Alliance; and (2) Ms. Tatum stuck her hand into the moving conveyor, an obviously dangerous activity for which no inadequate warning, defect, or other basis of liability could be held to account. We find neither argument availing.

The LPLA "establishes the exclusive theories of liability [in Louisiana] for manufacturers for damage caused by their products." La. R.S. § 2800.52.[2] The Louisiana Supreme Court has provided the following erudite summary of the standards governing LPLA actions:

> To maintain a successful products liability action under the LPLA, a plaintiff must establish four elements: (1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous;" and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else. La. R.S. 9:2800.54(A). A product is "unreasonably dangerous" under the LPLA if and only if the product meets at least one of the following criteria: (1) the product is unreasonably dangerous in construction or composition as provided in

---

[2] In diversity cases, we must apply the substantive law of the forum state, as interpreted by the state's highest court. See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 399 (5th Cir. 2008).

> La. R.S. 9:2800.55; (2) the product is unreasonably dangerous in design as provided in La. R.S. 9:2800.56; (3) the product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in La. R.S. 9:2800.57; or (4) the product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in La. R.S. 9:2800.58. La. R.S. 9:2800.54(B). "The claimant has the burden of proving the elements of Subsections A, B, and C of this Section [9:2800.54]." La. R.S. 9:2800.54(D).

Jack v. Alberto-Culver USA, Inc., 949 So. 2d 1256, 1258 (La. 2007). The court has also noted that products liability claims are, by nature, "extremely 'fact-intensive.'" Lawson v. Mitsubishi Motor Sales of Am., Inc., 938 So. 2d 35, 40 (La. 2006).

In this case, Ms. Tatum alleged that the dual strand conveyor was unreasonably dangerous (1) in construction or composition, (2) in design, and (3) due to inadequate warning.[3] Southern counters that Alliance's keeping the plugs station above the dual strand conveyor, and Ms. Tatum's sticking her hand into the conveyor (ostensibly to retrieve a dropped tool), were not "reasonably anticipated uses" of the conveyor. The "reasonably anticipated use" standard is a prerequisite of an LPLA claim. "[U]nless that threshold element is satisfied, a manufacturer does not have a legal duty to design its product to prevent such use." Butz v. Lynch, 762 So. 2d 1214, 1218 (La. App. 1st Cir. 2000).

An appropriate starting point in our analysis is to identify specifically Ms. Tatum's "use" of the dual strand conveyor. The Fifth Circuit has held that a plaintiff's

---

[3] Defense counsel is mistaken in omitting any reference to defects in construction or composition in the motion for summary judgment. (Doc. 37-7, p. 6). Both terms are clearly referenced in Ms. Tatum's complaint.

5

"use" of a product must include actions which do not "change the physical stresses placed on a product," but "nevertheless increase[] the risk of injury associated with the product." Kampen v. Am. Isuzu Motors, Inc., 157 F.3d 306, 311 (5th Cir. 1998). In that case, the plaintiff used a tire jack to elevate his daughter's vehicle. Id. at 308. The vehicle's manual included a warning instructing users "[n]ever to get under the car when using the jack." Id. at 309. Kampen nonetheless slid his upper body under the car, and suffered serious injuries when the jack collapsed. See id. Instead of simply constricting the "use" of the jack to merely jacking up the car, the court included Kampen's "behavior subsequent to the physical act of elevating the car (i.e., his crawling under the car)" and relying upon the jack while he was underneath the car. See id. at 310.

Applying these principles to the case at bar, both activities assailed by Southern fall within the term "use" for purposes of our analysis. In other words, Ms. Tatum's "use" of the dual strand conveyor did not merely include receiving the compressors transported by the machine. Instead, we must also consider Ms. Tatum's "uses" which "increase[d] the risk of injury associated with" the conveyor. Id. at 311. The "uses" of the dual strand conveyor which are relevant in this case include both the placing of the plug station above it, as well as Ms. Tatum's sticking her hand inside of it.

The scope of Ms. Tatum's "use" having been established, we now must consider whether these uses were "reasonably anticipated." Under the LPLA, the

term "reasonably anticipated use" is defined as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. R.S. § 2800.53(7). This term replaced the far less restrictive pre-LPLA standard of "normal use," and "conveys the message that the manufacturer is not responsible for accounting for every conceivable foreseeable use of a product." Boutte v. Kelly, 863 So. 2d 530, 546 (La. App. 4th Cir. 2003). By contrast, "a manufacturer is liable only for those uses it should reasonably expect of an ordinary consumer." Butz, 762 So. 2d at 1218.

"Reasonably anticipated use" is an objective standard. Green v. BDI Pharm., 803 So. 2d 68, 75 (La. App. 2d Cir. 2001). However, the parameters of the term remain inexact:

> "[R]easonably anticipated use" is a term of art, the scope of which is imprecise and lacking set criteria for its application. When determining whether a use was reasonably anticipated, courts have previously considered factors such as: (1) whether the injured party used the product in a manner that was obviously dangerous; (2) what the user was instructed to do and warned not to do with respect to the use of the product; (3) whether the use of the product was expressly warned against in the product's labeling (or operations manual) and the language of that warning; and (4) the sophistication/experience of the user-purchaser.

Broussard v. Procter & Gamble Co., 463 F. Supp. 2d 596, 606 (W.D. La. 2006) (citing 70 F.3d 803, 806 (5th Cir. 1995); Lockart v. Kobe Steel Ltd. Const. Mach. Div., 989 F.2d 864, 866 (5th Cir. 1993); Laird v. Deep Marine Tech., Inc., No. Civ.A. 03-2211, 2005 WL 22949, at *2 (E.D. La. Jan. 4, 2005); Frith v. John Deere Co., 955 F. Supp. 663 (W.D. La.

1996)).[4]

### 1. *Placement of the Workstation*

The first alleged "use" of the dual transport conveyor, involving the placement of the plugs station above the conveyor, is not dispositive of the instant motion. The design layout clearly reflects that the plugs station at which Ms. Tatum was injured was not located above the dual strand conveyor. However, it is unclear at this point whether Southern definitively relied upon the design layout in manufacturing the conveyor. Indeed, no testimony from Southern representatives reveals that the design layout was even consulted during the manufacturing process. To the contrary, Southern has admitted that the design layout "may not have been contained in the project file." (Doc. 49, p. 1). Thus, Southern's evidence in this regard is insufficient to prove the absence of a genuine issue of material fact.

Even if Southern could establish that the drawing was consulted in designing the dual strand conveyor, however, there is no evidence that Southern's designers were assured that employees would *never* work at or near the conveyor. In fact, Richard T. Speers ("Mr. Speers"), the Alliance employee who created the design layout, indicated that employees were free to move their workstations up and down the production line as they pleased. Mr. Speers also testified that he placed the plugs

---

[4] As will become evident, the first listed factor is preeminent in our analysis of this case. However, we have considered the other factors as well. No evidence of instructions or warnings regarding the dual strand conveyor is presently before the Court. An express warning, such as a caution sticker, was not provided, a factor which favors Ms. Tatum's position. The level of Ms. Tatum's sophistication with machinery such as the dual strand conveyor is not certain, but it is obvious that she had worked at this station for a substantial period of time prior to the accident, and had worked near conveyors enough to be generally familiar with the machines (and likely, their inherent dangers).

station on the design layout to avoid the danger of compressors tipping over. The placement was thus unrelated to the risk of harm created by the dual strand conveyor. Whether Southern was aware of these facts before it manufactured the dual strand conveyor remains contested. As such, Ms. Tatum has offered evidence sufficient to demonstrate the existence of a genuine issue of material fact.

Southern also offered testimony from Leon Linton ("Mr. Linton"), the company's owner. Mr. Linton stated that it was his "understanding" that no Alliance employees would be working on the dual strand conveyor. But, Mr. Linton did not testify that he came to that understanding through any firm assurance from Alliance that the plugs station would remain in a fixed location, away from the dual strand conveyor. Once again, this testimony fails to establish, beyond contest, that Southern relied upon the positioning of Alliance's employees in designing the dual strand conveyor. Stated differently, if Alliance did not eliminate the possibility that its employees would be exposed to the dual strand conveyor, then Southern accepted the risk that employees may work or pass near the conveyor. At least at this juncture, there is no uncontested evidence that Alliance eliminated that possibility. Therefore, summary judgment is unwarranted on this point.

    2.    *Ms. Tatum's Reaching Into the Conveyor*

Southern also contends, and Ms. Tatum does not dispute, that Ms. Tatum stuck her hand into the moving dual strand conveyor. Counsel for Ms. Tatum summarily disagrees with the notion that Ms. Tatum acted "purposely," but does not dispute

the cause of the accident. While Ms. Tatum does not clearly explain her action, Southern highlighted that both experts consulted in the case agree the accident occurred because Ms. Tatum reached into the conveyor, or more properly attempted to retrieve a dropped tool by reaching down into a gap in the rollers while a sprocket-driven chain was moving. It was the chain and sprocket mechanism which caught her glove and dragged her hand into a sprocket, causing her injury. The question becomes, then, how that act may impact our determination of liability under the LPLA.

Southern argues that Ms. Tatum's act of reaching into the dual strand conveyor constitutes an obvious danger, and therefore, that she should be barred from recovering under a products liability theory. There is certainly authority for the proposition that "reasonably anticipated use will not be found where the danger should have been obvious to the experienced consumer as well as the ordinary consumer." See, e.g., Frith, 955 F. Supp. at 666 (chronicling cases in accord). In other words, "reasonably anticipated uses" may not include uses of products which disregard an obvious or clear danger.[5]

---

[5] See, e.g., Matthews v. Remington Arms Co., Inc., No. 07-1392, 2009 WL 2970441, at *3 (W.D. La. Sept. 16, 2009) ("'Reasonably anticipated use' . . . does not suggest manufacturer liability for every conceivable or foreseeable use of its product. This is especially true when the danger presented by the consumer's misuse should have been obvious to the consumer, whether experienced or ordinary.'") (quoting Savant v. Beretta USA Corp., No. 05-1501, 2007 WL 1068481, at *3-4 (W.D. La. Apr. 4, 2007)); Blanchard v. Midland Risk Ins., 817 So. 2d 458, 461 (La. App. 3d Cir. 2002) (holding that "reasonably anticipated use" does not include "conduct that ignores or disregards an obvious or well-known danger"). These cases are not to be confused with cases in which a manufacturer has no duty to warn because "the user is aware of the danger or the danger is 'open and obvious.'" See, e.g., Abadie v. Metro. Life Ins. Co., 784 So. 2d 46, 79 (La. App. 5th Cir. 2001).

However, the inquiry continues with consideration of the role of negligence and its impact on the analysis. The fact that Ms. Tatum's act may have been negligent does not, in and of itself, render her "use" of the conveyor beyond the scope of Southern's reasonable anticipation. Some negligent acts may be reasonably anticipated, and may alter the apportionment of fault under Louisiana's comparative fault system instead of precluding any chance of recovery under the LPLA. See Kampen, 157 F.3d at 315-16. In Kampen, the Fifth Circuit addressed this issue:

> [A] plaintiff may act in relation to a product in such a way that, while it does not change the physical stresses placed on a product, nevertheless increases the risk of injury associated with the product. A manufacturer is required to take these kinds of actions by product users into account when designing and providing warnings for its product. Surely the manufacturer, Isuzu, was required to contemplate not only the risks associated with the proper physical manipulation of the jack, but also the risks associated with the purpose for which the jack would be employed (i.e., whether the jack would be used for changing tires or instead as a support for repairs to the car's undercarriage).

Id. at 311. The Kampen court further described the relationship between comparative fault and the concepts of "reasonably anticipated use" and adequate warnings:

> We recognize that, under Louisiana law, comparative fault principles generally account for a plaintiff's negligent conduct. But it is argued that our view of Kampen's "use," combined with our view of the interrelationship between warnings and reasonably anticipated use, impermissibly conflates "product misuse" and a plaintiff's comparative fault. The argument goes that we are making "reasonably anticipated use" do the work that comparative fault is intended to do by including Kampen's negligence in getting under the car as part of his "use" of the jack.
>
> It is true that Kampen's disregard of the product's warnings and his exposing himself to obvious danger is the kind of conduct that, ordinarily, would be assigned to the plaintiff as a percentage of fault

under the Louisiana system of comparative fault. It is equally true, however, that the Louisiana Legislature, in drafting the LPLA, included the following prerequisite to recovery under the Act: ". . . when such damage arose from a reasonably anticipated use of the product. . . ." That language raises "reasonably anticipated use"-a concept that necessarily includes some aspects of a plaintiff's conduct-to the level of liability determiner (i.e., if a plaintiff has engaged in conduct which renders his use of the product not reasonably anticipated by the manufacturer, then his recovery is not merely reduced by his percentage of fault-he cannot recover at all).

This view does not, however, write comparative fault out of Louisiana products liability law. A plaintiff's negligent conduct which does not remove his use of the product from the realm of reasonably anticipated uses may nevertheless contribute to cause his injuries. Such negligence will lessen a plaintiff's recovery without barring his right to recover altogether. Suppose, for example, that Kampen had used the jack only to change a tire and the jack had collapsed; the manufacturer had provided no adequate instructions regarding the use of the jack, and the correct manner of use was not obvious; the collapse occurred partly as a result of Kampen's negligent failure to fit the lifting arm of the jack into a special notch and partly as a result of some unrelated defect in the jack's composition. In this example, Kampen used the jack to change a tire, but physically manipulated the jack in an improper manner that was not specifically warned against nor obviously dangerous. We submit that this hypothetical negligent use would be "reasonably anticipated"; the manufacturer would be liable and damages apportioned by comparative fault.

It is also pointed out that Kampen's placing himself beneath the car did not make the jack any more or less likely to fail. It is urged that when a plaintiff misuses a product (i.e., uses the product in a way not reasonably anticipated by the manufacturer), that misuse should only bar the plaintiff's recovery where the misuse causes the product to fail. In other words, there must be a causal connection between product misuse and product failure.

While that may be an eminently reasonable view of what products liability law should be, it is, however, not what the Louisiana Legislature codified in the LPLA. The threshold requirements for liability under the LPLA do not link product misuse with product failure. Instead, the LPLA requires a link between damages and reasonably

>anticipated use. The flip side of that requirement is that if damages are linked to a product misuse (i.e., one that is not reasonably anticipated), then those damages are not recoverable under the Act.

Id. at 315-16 (internal citations omitted). The Kampen court drew a fine distinction between types of negligent conduct which do and do not "remove [the injured party's] use of the product from the realm of reasonably anticipated uses." Id. at 315. In the absence of more specific guidance as to the types or gradations of negligence which may impact this distinction, we are forced to evaluate Ms. Tatum's conduct "free-handedly." In other words, we must determine whether Ms. Tatum's purported negligence is supported by the summary judgment evidence, and if so, which side of the Kampen court's line her actions fall upon.

Jurisprudence interpreting the LPLA provides significant insight into our decision. Louisiana courts have held that various uses (or misuses) of products, which one might construe as "obviously dangerous," were not "reasonably anticipated." Such uses include taking nonprescription medication in excessive doses[6], walking across the middle of a grain trailer as rice was being unloaded from the trailer[7], inhaling the contents of a can of air brush propellant to become intoxicated[8], standing on the rear portion of a folding chair seat[9], or, in this Court, descending a ladder at a dangerously steep angle in contravention of an express

---

[6] Green, 803 So. 2d at 75-76.

[7] LaSalle v. Wilson Trailer Co., Inc., 787 So. 2d 1173, 1179 (La. App. 3d Cir. 2001).

[8] Butz, 762 So. 2d at 1218.

[9] Myers v. Am. Seating Co., 637 So. 2d 771, 779 (La. App. 1st Cir. 1994).

warning printed on the ladder[10].

Other dangers, which we perceive as less "obvious," have also precluded recovery under the LPLA. For instance, in Daigle v. Audi of America, Inc., a prospective used car buyer was attempting to locate the hood latch of a 1979 Audi. 598 So. 2d 1304, 1305 (La. App. 3d Cir. 1992). After he failed to locate the latch behind the front of the hood, the buyer "stuck his hand at least an inch or an inch and a half beyond the flare, without knowing where he was reaching and with the engine running." Id. The buyer's fingers were caught in the belt pulley of the engine, resulting in injuries to his hand. Id. The Louisiana Third Circuit court affirmed the trial judge's ruling that "the manufacturer did not . . . or does not have to anticipate, in the normal use of handling of its product, that a person will stick his fingers beyond the flair[sic] of the front of the vehicle, without making a visible reconnoiter of what is there. . . . [e]specially . . . when the engine is running." Id. at 1307.

Similarly, in Hunter v. Knoll Rig & Equipment Manufacturing Co., Ltd., the decedent was killed while racking pipes on a drilling rig. 70 F.3d 803, 804 (5th Cir. 1995). The decedent was a "derrickman" on the rig, and was largely responsible for monitoring the "lean" or angle of the pipes as they were stacked in the racking board (which was the product at issue in the case). See id. at 805. One danger involved in the process is allowing the pipes to develop a "negative lean," or a lean such that the pipes could fall toward the mast. See id. The manufacturer was "aware of the

---

[10] Carter v. Louisville Ladder Group, LLC, No. Civ.A. 3:04-CV1324, 2005 WL 3088613, at *6-7 (W.D. La. Nov. 17, 2005).

possibility of negative lean and the attendant risk," but testimony indicated that it was uncommon, "dangerous[,] and against industry practice, to allow a negative lean to subsist." See id. at 808-09. In all, the evidence indicated that the negative lean created a condition which was "obviously dangerous," or "should have been obvious to the ordinary user of racking boards. . . . [and] certainly obvious to the experienced workers." Id. at 810. The court held that "the LPLA imposes manufacturer liability only if the accident occurred during a reasonably anticipated (manufacturer should have reasonably expected) use, not a reasonably foreseeable use or misuse," and thus, rendered judgment against the plaintiffs on the LPLA claim. Id.

While these cases place great emphasis on the user's perception of dangers in a product, however, significant emphasis should also be placed upon the manufacturer's knowledge of potential dangers in their products. For instance, a plaintiff was seriously injured in a car accident during which the plaintiff was wearing a seatbelt with "excessive slack." Boutte, 863 So. 2d at 546. The court held, however, that the manufacturer reasonably anticipated that car passengers could be wearing the seatbelt with excessive slack, because the manufacturer "knew that slack could be introduced inadvertently into the seat belt through normal movements inside the vehicle." Id. Similarly, an industrial tool company was held accountable for its design of an electric power drive which was being used as a pipe threader because the company "should have reasonably expected the [power drive] to be used as a power tool in a vertical position." Simon v. Am. Crescent Elevator Co., 767 So. 2d

15

64, 74 (La. App. 4th Cir. 2000). The court relied upon expert testimony establishing that the tool was a powerful device capable of being "used in a number of other vertical applications." See id.

From all of these cases, it is clear that the reasonably anticipated use standard has no absolute, definitive boundaries. Rather, courts must make determinations on something of an ad hoc basis, considering the relative negligence of manufacturers and users on a sliding scale basis.[11] In this case, we find that Ms. Tatum's (and Alliance's) uses of the dual strand conveyor were "reasonably anticipated uses." A number of factors support this conclusion.

First, the complete lack of warning signs or guards on the dual strand conveyor arguably violated industry standards. More specifically, a standard specific to conveyor systems released by the American National Standards Institute ("ANSI") provides that, "[w]here necessary for the protection of personnel from hazards, all exposed moving machinery parts that present a hazard to personnel at workstations or operators' stations shall be mechanically or electrically guarded or guarded by location." ASME B20.1-2003, Safety Standards for Conveyors and Related Equipment, ¶ 5.9.1.1. Although ANSI standards are not legally binding upon the Court, they are certainly relevant to our determination of what types of dangerous uses Southern may have reasonably anticipated. In another LPLA case, the Fifth Circuit held that the

---

[11] This Court's review of the relevant jurisprudence has revealed no identifiable "breaking point" at which a user's negligence precludes recovery. It is the Court's duty to determine at what point the user's negligence, if any, places a particular use beyond the scope of "reasonably anticipated uses."

existence of an ANSI standard regarding washing and ventilating fuel-containing generators materially affected whether the defendant manufacturer could have reasonably anticipated that the plaintiff would improperly use its generators. Taylor v. United Tech. Corp., 117 F. App'x 961, 963 (5th Cir. 2004).

In this case, we find that the ANSI standard has significant bearing upon the scope of "reasonably anticipated uses" of the dual strand conveyor. This standard, along with deposition testimony from both experts retained in the case, establishes, at a minimum, that the need for guards at conveyor pinch points is a widely known (and generally mandatory) requirement. The Taylor court characterized ANSI standards as "[w]ell-accepted industry standards," and found that the manufacturer reasonably anticipated that those standards would be followed. See id. In this case, the converse conclusion is equally fair: Southern should have reasonably anticipated misuses of its dual strand conveyor which are explicitly contemplated in well-accepted industry safety standards.[12]

Second, the record before the Court indicates that all of the other conveyors in Alliance's plant (which vastly outnumber the one thirty-foot section of conveyor produced by Southern) were equipped with guards and marked with warning stickers. The purpose of these precautions, naturally, is to protect employees from

---

[12] We find Southern's reliance upon the concept of "guarding by location" to be premature, if not untenable, at this stage. Conveyors are considered guarded by location when there is "[r]emoteness from frequent presence of public or employed personnel." ASME B20.1-2003, Safety Standards for Conveyors and Related Equipment, ¶ 5.9.2(a). In this case, there remains at least a genuine issue of material fact as to whether the dual strand conveyor, in Southern's estimation, would have been remote from the frequent presence of employees.

accidents, such as the one Ms. Tatum suffered. Clearly, manufacturers and industry organizations have anticipated that accidents may take place without the implementation of certain safety measures around these dangerous machines. Indeed, the very machines abutting and surrounding the dual strand conveyor installed by Southern had such precautions.

Finally, Southern was never given a firm assurance that employees would not be exposed to the dangers of an exposed sprocket mechanism. Southern argues that, according to the design layout, Ms. Tatum should never have been working near the dual strand conveyor. However, even if Southern possessed and relied upon the design layout (which are contested issues of fact), the layout itself failed to eliminate Ms. Tatum's use as a possible one, by design, warning, or other instruction. Under the evidence presently before the Court, then, Southern accepted the risk that employees may be working near the dual strand conveyor.

In light of these factors, we conclude that Southern is not entitled to summary dismissal of Ms. Tatum's claims. Ms. Tatum's accident took place in an industrial plant, where various dangers and exigencies should reasonably be anticipated by employers and product manufacturers.[13] The relatively unique combination of factors in this case pushes Ms. Tatum's accident beyond the realm of merely possible or foreseeable accidents, and into the realm of reasonably anticipated uses. For that

---

[13] For this reason, Ms. Tatum's case is distinguishable from other products liability cases in which the reasonably anticipated use standard has precluded a plaintiff's claims. The distinction is rooted in the location and circumstances of the accident. Ms. Tatum was not abusing a chemical product or standing on the back of a folding chair. She was also not using a product at her home or at a used car dealership when the accident took place. Those facts are significant in our determination of what uses of its conveyor Southern should have reasonably anticipated.

reason, Southern's Motion for Summary Judgment (Doc. 37) will be DENIED.

### III. Conclusion

There are undoubtedly questions remaining in this case regarding the degree of fault that must be attributed to Ms. Tatum in her unfortunate accident. Likewise, issues related to a determination of who is responsible for the defective design of the dual strand conveyor – Southern, Alliance, or both - loom large as well. We recognize that our denial of summary judgment rests on narrow factual footing in light of Louisiana jurisprudence interpreting the "reasonably anticipated use" standard. Yet such intricate factual determinations are better suited for trial. Therefore, we will not preclude Ms. Tatum's claims at this early stage.

SIGNED on this 19th day of July, 2010 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE